

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| PETER MANUEL CANDELARIA, | § | No. 08-20-00009-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | 118th District Court |
| THE STATE OF TEXAS, | § | of Howard County, Texas |
| Appellee. | § | (TC#15,558) |
| | § | |

## **O P I N I O N**

Appellant, Peter Manuel Candelaria, appeals his conviction of aggravated assault on a public servant, to-wit: Steve Henry. TEX.PENAL CODE ANN. § 22.01(b).[1] In a single issue, Appellant challenges his conviction, asserting the evidence is legally insufficient. We affirm.

**BACKGROUND**
*Factual Background*

---

[1] Appellant was charged with seven offenses arising out of a single criminal action. At trial, the State filed a motion to join all seven offenses, which was granted. Appellant challenges his conviction in seven separate appeals—08-20-00007-CR, 08-20-00008-CR, 08-20-00009-CR, 08-20-00010-CR, 08-20-00011-CR, 08-20-00012-CR, and 08-20-00013-CR. Carrying forward Appellant's individual structure, we address each appeal separately. This particular appeal solely addresses appellate cause number 08-20-00009-CR, which involves the offense of aggravated assault on a public servant, to-wit: Steve Henry. Additionally, this case was transferred from Eastland Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX.GOV'T CODE ANN. § 73.001. We follow the precedent of the Eastland Court of Appeals to the extent they might conflict with our own. *See* TEX.R.APP.P. 41.3.

The Big Spring Police Department had actively been attempting to locate and arrest Appellant for outstanding warrants. On the morning of December 28, 2018, Sergeant Steve Henry and Investigator Dustin Thomas conducted surveillance at a known residence of Appellant. Sergeant Henry and Investigator Thomas sat and surveilled from their respective unit vehicles— unmarked trucks equipped with red and blue lights, sirens, and radio. Based on information the officers had, they believed Appellant drove a burgundy or red Buick, and knew the license plate number. After not detecting activity, the officers took their lunch break and left the location. After lunch, Investigator Thomas returned to the location and notified Sergeant Henry that he detected movement; Appellant was "getting in and out of the house and to the vehicle." Sergeant Henry was in communication with Investigator Thomas while en route to the surveilled address when he detected the burgundy Buick and positively identified the driver as Appellant. Sergeant Henry then pulled up behind Appellant, activated the emergency lights of his undercover unit and notified dispatch of the pursuit. Appellant continued to accelerate, ran at least two stop signs, and at one point, drove in the wrong direction on a one-way street. The vehicle then stopped, and two individuals exited the vehicle—Appellant and a female. Appellant ran away and a foot pursuit ensued.

Several law enforcement officers responded to the scene upon learning of the pursuit via radio-dispatch and a search for Appellant followed. Investigator Thomas searched an alleyway and ultimately found Appellant hiding inside of a dumpster holding a firearm to his head. After confirming Appellant was armed and alerting the others, the officers all took cover. The situation morphed into what the officers described as a "standoff" that lasted over two hours. The officers involved in the standoff include: Chris Dominguez, Steve Henry, Chris Mahurin, Dustin Thomas,

Marc Thomas, and Rory Gammons—who are all alleged, individual victims of Appellant's respective convictions for aggravated assault on a public servant. At the time Appellant opened fire, the approximate locations of the officers were as follows: Investigator Dustin Thomas, Detective Dominguez, and Investigator Marc Thomas all standing side by side in very close proximity to one another. Lieutenant Mahurin was located a few feet north of and parallel to the aforementioned officers. Investigator Gammons was located just behind and west of Detective Dominguez.

After Appellant opened fire in the direction of the officers, Sergeant Marcus Thomas returned fire and shot three rounds, one of which struck Appellant's hand. Investigator Angelica Wilkins, a certified law enforcement negotiator, eventually convinced Appellant to surrender and exit the dumpster. A 9-millimeter pistol was retrieved from Appellant, and three empty shell casings from that pistol were later found. Appellant was arrested and taken to a hospital where he received medical treatment for his injury.

It is uncontested that during the standoff, Appellant refused to obey commands, and threatened his own life and the officers' lives; Appellant made clear he was either going to shoot himself once he was found, or the officers would have to kill him because he was not going back to prison—a tactic known as "suicide by cop." The testimony, however, from each respective officer, varies in regard to the number of shots heard or seen fired from Appellant's pistol.

### *Procedural Background*

Appellant was charged with aggravated assault on a public servant, to-wit: Chris Dominguez. The jury found Appellant guilty and sentenced him to the Institutional Division of the Texas Department of Criminal Justice for a term of sixty years. This appeal followed.

**DISCUSSION**

In a single issue, Appellant seeks reversal of his conviction, asserting the evidence is legally insufficient. We disagree.

*Standard of Review and Applicable Law*

Under the Due Process Clause of the U.S. Constitution, the State is required to prove every element of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In *Brooks*, the Texas Court of Criminal Appeals held the only standard a reviewing court should apply when examining the sufficiency of the evidence is the legal sufficiency standard articulated in *Jackson*, which requires affording deference to the jury's credibility and weight determinations. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010).[2] The critical inquiry in a legal sufficiency challenge is whether the evidence in the record could reasonably support a conviction of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007).

When reviewing the legal sufficiency of the evidence, we must view all of the evidence in the light most favorable to the verdict to determine whether any rational juror could have found the defendant guilty of the essential elements of the offense beyond a reasonable doubt. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex.Crim.App. 2005). A lack of direct evidence is not dispositive on the issue of the defendant's guilt; guilt may be established by circumstantial evidence alone. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004). We measure the evidence by the

---

[2] Appellant incorrectly asserts a *factual* insufficiency claim; the court in *Brooks* abandoned the factual sufficiency standard, codifying it to a standard of legal sufficiency. 323 S.W.3d at 915 (Cochran, J., concurring op.)("To declare the evidence factually insufficient necessarily turns an appellate judge, viewing only the cold written record, into a self-appointed thirteenth juror with absolute veto power over the twelve citizens who actually saw the witnesses, heard the evidence, and reached a rational, reasonable verdict.").

4

elements of the offense as defined by a hypothetically correct jury charge. *Thomas v. State*, 303 S.W.3d 331, 333 (Tex.App.—El Paso 2009, no pet.)(*citing Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997)). A hypothetically correct charge accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Malik*, 953 S.W.2d at 240.

We bear in mind that the trier of fact is the sole judge of the weight and credibility of the evidence, and we must presume the fact finder resolved any conflicting inferences in favor of the verdict and we defer to that resolution. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014) (*citing Jackson*, 443 U.S. at 319). A reviewing court may not reevaluate the weight and credibility of the evidence or substitute its judgment for that of the fact finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010). Our only task under this standard is to determine whether, based on the evidence and reasonable inferences drawn therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

A person commits assault if the person intentionally or knowingly threatens another with imminent bodily injury. TEX.PENAL CODE ANN. § 22.01(a)(2). A person commits aggravated assault on a public servant if assault is committed as defined in Section 22.01, and the person uses or exhibits a deadly weapon during the commission of the assault against a person whom the actor knows is a public servant while the public servant is lawfully discharging an official duty. TEX.PENAL CODE ANN. §§ 22.02(a)(2), 22.02(b)(2)(B).

As applicable to the offense of aggravated assault on a public servant in this case, a hypothetically correct jury charge would ask whether Appellant: (1) intentionally or knowingly; (2) threatened another with imminent bodily injury by use of a deadly weapon; (3) against a person

whom he knew was a public servant while the public servant was lawfully discharging an official duty. *Id*.

*Analysis*

In the instant case, Sergeant Henry of the Big Spring Police Department was heavily involved in Appellant's ultimate arrest. Sergeant Henry spent the day surveilling Appellant in an attempt to arrest him for outstanding warrants; the surveillance led to the vehicle pursuit, the foot pursuit, and the eventual standoff. After the vehicle pursuit, Sergeant Henry saw Appellant exit his vehicle and began to chase after Appellant, but soon after lost sight of him. While searching the area, Sergeant Henry heard what he described as a "loud metal thump," then led his surrounding officers to the alleyway where he was located via radio. While continuing the search, Sergeant Henry heard Investigator Dustin Thomas yell, "There he is," and as Sergeant Henry approached, he saw Appellant inside of a dumpster with a firearm.

Sergeant Henry described the moments immediately proceeding as:

Q. When you say 'up like this' --

A. It was up like this (*indicating*). It wasn't pointed directly at his head. It was like this (*indicating*), like in front of him.
    As I'm drawing, I'm stepping up to the Dumpster, coming up over the top of it, and that's when he was coming at me. He's got the advantage on me because he's down and I'm up high.
    I start to pivot off the Dumpster itself, to turn, and that's when a shot rang out. I yelled, 'Gun,' and then that's when a shot rang out.

Q. Is he laying down? Crouched? Standing? What's his position?

A. He's laying down with his -- I would say his shoulders and his head to the west and his feet to the east . . . .

Q. And you yell, 'Gun,' and then there's a gunshot?

A. Yes. As I'm coming up, I see him, I see a gun, I'm drawing my duty weapon. I

6

say 'Gun,' and before -- I have to come up over the top of the -- he had the advantage on me and he's coming towards me -- I'm sorry.

He's coming towards me with the firearm, and that's when I pivot off the Dumpster itself, the bottom of it, with my feet to turn, and that's when I hear and see the shot ring out towards my face.

Q. Do you see the barrel of the gun when it's discharged?

A. I do see the barrel.

Q. Where was it pointing?

A. It swept right across my face when I saw it go off.

Q. How do you know it swept across your face?

A. I saw it sweep across my face.

Q. You mean the barrel of the gun?

A. The barrel.

Q. Okay. Did you feel anything?

A. I felt the percussion of the gun. And at this time as I pivoted, I actually dove from about right here (*indicating*) onto the front of the Tahoe and pulled myself over to this side behind the engine block for cover, and I was assessing myself because I thought I got shot in the face.

Q. Had you been shot in the face?

A. I was not. It was just the percussion from the blast itself went past my ear and my eye.

Q. So now we've got a suspect with a gun and he's used the gun and he's shot at you?

A. Yes.

Sergeant Henry proceeded to take cover behind a police unit, approximately five to six feet away from Appellant, and testified to hearing Appellant yell something along the lines of, "I'm not coming out alive. Y'all going to have to kill me or I'm going to kill y'all." Attempting to effect

7

Appellant's vision and protect his fellow officers, Sergeant Henry defused pepper spray into the dumpster. Sergeant Henry recalled as soon as he sprayed it, he saw Appellant's hand come up over the dumpster, saw the firearm parallel to the ground, and a shot was fired in the direction of a fellow officer. Not knowing whether the first defusal was effective, Sergeant Henry defused pepper spray into the dumpster a second time. He saw Appellant's hand come up again and shoot horizontally in the same way. Sergeant Henry specified the second shot was in the direction of the officers. He then heard three rifle shots—referring to the shots fired by Deputy Marcus Thomas—to which he heard Appellant respond, "You shot me. You shot me. . . . It's on now." Sergeant Henry's testimony concluded with discussion of Appellant's refusal to obey commands and threatening his life and the officers' lives until he was eventually arrested.

Appellant himself also testified and admitted to firing his pistol at least three times. The following exchange between Appellant and the prosecutor occurred:

Q. Were you attempting to frighten the officers away?

A. Yes. I wanted them to get away from me.

Q. So your intent was to threaten them by firing that weapon?

A. To scare them, yes.

Appellant argues the testimony is to confusing, conflicting, and unreliable to support his conviction. The State counters by asserting testimonial conflicts present issues of fact and credibility for the jury to decide. We agree. The trier of fact is the sole judge of the weight and credibility of the evidence and we must we defer to that resolution. *Dobbs*, 434 S.W.3d at 170.

Based on the evidence, the following testimony and the reasonable inferences drawn therefrom, we deduce a rational jury could have concluded Appellant: (1) intentionally or

knowingly; (2) threatened Steve Henry with imminent bodily injury; (3) knowing he was a public servant while lawfully discharging an official duty. TEX.PENAL CODE ANN. §§ 22.01, 22.02. The evidence is legally sufficient to support Appellant's conviction. Appellant's sole issue is overruled.

We note that the trial court's judgment included in the clerk's record contains a clerical error. The judgment is titled, "Judgment of Conviction by Jury" and, on its face, indicates that Appellant entered a plea of not guilty to the offense of aggravated assault against a public servant. The degree of offense recites "1ST DEGREE FELONY." The findings on deadly weapon reflect "YES, A FIREARM." The statute for offense states "22.01(b) Penal Code."

TEX.PENAL CODE ANN. § 22.01(b)(1), assault, provides the following:

(b) An offense under Subsection (a)(1) is a Class A misdemeanor, except that the offense is a felony of the third degree if the offense is committed against:

(1) a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant;

However, TEX.PENAL CODE ANN. § 22.02(b)(2)(B), aggravated assault, is defined as:

(b) An offense under this section is a felony of the second degree, except that the offense is a felony of the first degree if:

.          .          .

(2) regardless of whether the offense is committed under Subsection (a)(1) or (a)(2), the offense is committed:

.          .          .

(B) against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant.

The judgments in Appellant's companion cases 08-20-00011-CR, 08-20-00012-CR, and 08-20-00013-CR all reflect the level of offense as "22.02(b)(2)(B)." The record before us makes

9

it clear Appellant was convicted of aggravated assault of a public servant pursuant to TEX.PENAL CODE ANN. § 22.02(b)(2)(B).

We have authority to reform the judgment of the court below to make the record speak the truth when we have the information necessary to do so. TEX.R.APP.P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex.Crim.App. 1993). This Court may reform judgments and correct typographical errors. *French v. State,* 830 S.W.2d 607, 609 (Tex.Crim.App. 1992). Further, Appellate courts can reform whatever the trial court could have corrected by a judgment *nunc pro tunc* where the evidence necessary to correct the judgment appears in the record. *Robinson v. State*, 568 S.W.3d 718 724-25 (Tex.App.—Amarillo 2019, no pet.). We reform the judgment by replacing "22.01(b)" with "22.02(b)(2)(B)" to reflect conviction under the correct statute.

## CONCLUSION

Having overruled Appellant's sole issue on appeal, the judgment as reformed, is affirmed.

April 23, 2021

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)

10